Ryan B. Bell (9956)
Marcia Fuller Durkin (9973)
**KUNZLER BEAN & ADAMSON, PC**
50 W. Broadway, 10th Floor
Salt Lake City, Utah 84101
Telephone: (801) 994-4646
Facsimile: (801) 758-7436
rbell@kba.law
mdurkin@kba.law

*Counsel for Plaintiff Jordan Hart*

| |
|---|
| If you do not respond to this document within applicable time limits, judgment could be entered against you as requested. |

---

## IN THE FOURTH JUDICIAL DISTRICT COURT
## IN AND FOR SALT LAKE COUNTY, STATE OF UTAH

| | |
|---|---|
| JORDAN HART, an individual, | **COMPLAINT** |
| Plaintiff, | |
| v. | Case No.: _____ |
| BRITTANY TEASDALE, an individual, | Judge:_____ |
| Defendant. | TIER 3 |

Mr. Jordan Hart ("Mr. Hart" or "Plaintiff") by and through his above counsel of record, hereby complains and alleges against Ms. Brittany Teasdale, a/k/a Brittany L'Amour or Brit L'Amour ("Ms. Teasdale" or "Defendant") as follows:

## PARTIES

1.      Mr. Hart is an adult individual residing in Las Vegas, Nevada.

2.      Ms. Teasdale is an adult individual residing, upon information and belief, in Mapleton, Utah.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction pursuant to Utah Code Ann. §§ 78A-5-102(1) and 78B-3-205.

4.      Because this is a civil action for defamation, defamation per se, false light invasion of privacy, public disclosure of private facts, and abuse of process, venue is proper pursuant to Utah Code Ann. § 78B-3-306.

5.      Pursuant to the Utah Rules of Civil Procedure, Mr. Hart files this Complaint as a Tier 3 Complaint.

## FACTUAL ALLEGATIONS

**Divorce of Mr. Hart and Ms. Teasdale**.

6.      On June 10, 2017 Mr. Hart and Ms. Teasdale married after having dated for approximately nine months.

7.      That marriage lasted a little less than a year when Mr. Hart and Ms. Teasdale separated in May of 2018.

8.      Ms. Teasdale initially filed for an annulment in May 2018 but the two ultimately divorced when it was determined that they did not meet the legal requirements for an annulment.

9.      Prior to a trial on the divorce, on January 14, 2019, Mr. Hart and Ms. Teasdale engaged in a divorce mediation.

10.     During the course of that mediation, Mr. Hart and Ms. Teasdale were able to reach agreement on the terms of their divorce decree.

11.     A Decree of Divorce was entered by the court on January 24, 2019.

12.     The terms of the Divorce Decree restrained both Mr. Hart and Ms. Teasdale from "Engaging in legal defamation."  *See* Divorce Decree 12(a).

13.     The terms of the Divorce Decree required that both Mr. Hart and Ms. Teasdale be restrained "[f]rom using the likeness or name of the other party for any negative or potentially prejudicial purpose."  *Id.* at 12(c).

**Criminal Accusations by Ms. Teasdale**

14.     On or about May 4, 2018, Ms. Teasdale went to the authorities and alleged that Mr. Hart, without her consent, had distributed an intimate image of her.

15.     In her May 4, 2018 statement to police, Ms. Teasdale, in discussing her sexual relationship with Mr. Hart, conceded that during their marriage "most of the time I didn't say 'no' or 'stop'" when she and Mr. Hart were engaged in sexual relations.

16.     Further, in her May 4, 2018 statement, Ms. Teasdale fails to identify a single instance in which Mr. Hart engaged in sexual relations with Ms. Teasdale which were not consensual.

17.     Ms. Teasdale admitted to a physician examining her on or about May 8, 2018 that the sexual relations she participated with Mr. Hart were consensual and that she did not ever say no to those acts.

18.     In February 2019, Mr. Hart took a plea in abeyance related to the intimate image charge.  He later was briefly incarcerated for this charge.

19.     Upon information and belief, Ms. Teasdale was unhappy that her marriage ended in divorce rather than an annulment and, as a result, scheduled an interview with police the day after the divorce mediation concluded.

20.     On January 15, 2019, the day after the divorce mediation, Ms. Teasdale met with a detective to discuss filing claims against Mr. Hart related to sexual abuse during their marriage and alleged, for the first time, that there was non-consensual sexual activity during the course of her marriage with Mr. Hart.

21.     The information Ms. Teasdale provided to police in January 2019 differed significantly from the statement she provided to police in May 2018 where she did not mention any purported sexual abuse by Mr. Hart.

22.     In the January 15, 2019 statement to police, Ms. Teasdale acknowledged that she rarely asked Mr. Hart to stop during their sexual relations and on the occasions she did ask him to stop, he stopped long enough to make sure she was ok before continuing with their sexual encounter.  Ms. Teasdale further noted that Mr. Hart never physically abused her during the course of their marriage.

23.     Ms. Teasdale provided another statement to law enforcement on or about March 30, 2019.  On that occasion Ms. Teasdale claimed, for the first time, that Mr. Hart had forced himself on Ms. Teasdale and performed oral sex on her without her consent.

24.     Mr. Hart first became aware of felony charges for sexual assault filed against him in May 2020.

25.     On or about February 25, 2021, Ms. Teasdale provided a witness statement wherein she, for the first time, alleged that there were three specific instances which she classified as sexual abuse perpetrated by Mr. Hart.

26.     Ultimately, the felony sexual assault charges against Mr. Hart were dismissed on September 3, 2021 following a Motion to Dismiss the Court granted in Mr. Hart's favor.

27.     Ms. Teasdale provided significantly differing statements to authorities regarding her relationship with Mr. Hart between May 2018 and February 2021.

28.     The reality is that Mr. Hart never forced Ms. Teasdale to engage in any sexual conduct before or during their marriage.

29.     Instead, Ms. Teasdale made false reports to law enforcement regarding allegations of sexual abuse/domestic violence and sex-trafficking both as retaliation for Mr. Hart's conduct during and after their marriage and in an effort to bolster her social media profile.

**Ms. Teasdale's Statements on Social Media and to the Public**

30.     During the course of the marriage between Mr. Hart and Ms. Teasdale and in the years thereafter, Ms. Teasdale desired to be a "social media influencer."

31.     In an effort to build her social media profile, Ms. Teasdale posted and continues to post regularly to her social media accounts.

32.     Ms. Teasdale currently operates and posts on the following social media profiles:

    a.   Facebook: "Brit Lamour," https://www.facebook.com/brittany.hart.a;

    b.   Facebook: "Brit L'Amour," https://www.facebook.com/britlamour;

    c.   Instagram: "@brit_lamour," https://www.instagram.com/brit_lamour/;

    d.   Instagram" "@alifeworthliving.show,"
         https://www.instagram.com/alifeworthliving.show/.

    e.   TikTok: @britlamour, https://www.tiktok.com/@britlamour; and

    f.   YouTube: @britty3769, https://www.youtube.com/@britty3769.

33.     As of the date of this Complaint, Ms. Teasdale has at least 3,100 followers on Facebook, 40,000 followers on TikTok, and 60,000 followers on Instagram.

34.    Her most-viewed video on Instagram has more than 5.9 million views.

35.    Ms. Teasdale has at least 6 Instagram videos that each have over a million views.

36.    Her most-viewed video on TikTok has more than 1.4 million views.

37.    Ms. Teasdale also has a website, https://britlamour.com, where she regularly posts content.

38.    On her website, Ms. Teasdale maintains a blog where she provides details regarding her life.

39.    Despite the prohibition in her Divorce Decree regarding engaging in legal defamation, Ms. Teasdale has, on numerous occasions, made false and defamatory statements regarding Mr. Hart, intending to paint him in a false light and to interfere with his private life.

40.    Such false and defamatory statements have appeared on Ms. Teasdale's TikTok account, her Instagram account, and on her blog.

41.    Through her social media accounts, including her website, Ms. Teasdale has publicly stated that Mr. Hart abused her during the course of their marriage.

42.    She has also publicly claimed that she was the victim of sex trafficking by Mr. Hart.

43.    Such defamatory statements include the following:

a.    "I went through an abusive marriage & I didn't think I would make it out."

b.    "I am a survivor of sexual assault, online sex-trafficking, sexual exploitation, physical abuse and emotional abuse."

c.    "In my witness statement, it included that while we were married, I found contracts between my ex-husband and another man.  He told that man, 'she will be ready

for in-person services soon', referring to my sexual services.  I then saw that the person

who my ex-husband was talking about selling for in-person services … was me."[1]

      d.      "4 years ago, I went through an abusive marriage and barely made it out"

      e.      "I never would've believed you if 4 years ago you told me, I could get out

of an abusive relationship"

      f.      "Listen to hear the anticipated release of Brit L'Amour's story – After the

divorce of her parents, a victim to emotional, mental, physical & sexual abuse, homeless

at age 18, trafficked by her own husband, the escape of a false marriage, and a survivor of

suicide, Brit dives into how she heals and how she has discovered her true mission in

life."

      g.      "I was not the only one who had been sexually abused by this man."

      h.      "Rape can absolutely happen within a marriage.  No means no, even if you

are married."

44.      All of these statements were posted to Ms. Teasdale's social media accounts and

or website since December 2021.

45.      Moreover, Ms. Teasdale's social media accounts go back several years and many

of those posts, which are still available to access, contain defamatory statements regarding Mr.

Hart.

46.      For example, on August 9, 2021, Ms. Teasdale claims in a TikTok video "I was

raped multiple times by the same person."

---

[1] This particular posting on Ms. Teasdale's website, made in January 2022, has since been edited and this particular sentence removed after Mr. Hart demanded that Ms. Teasdale stop making defamatory comments regarding him. As set forth herein, Ms. Teasdale remains liable for the damage causes by these allegations.

47.     Similarly, on October 2, 2022, Ms. Teasdale's blog post indicated: "In addition because of extreme sexual abuse and severe trauma I experienced later in my life, I struggled with paranoia after escaping my abuser.  He had sent men after me when I fled the state.  They would call me on unknown numbers and tell me what I was wearing in that exact moment and what they were going to do to me sexually."

48.     Ms. Teasdale publicly referenced that Mr. Hart was charged with a first degree felony for multiple counts of sexual assault of Ms. Teasdale, falsely alleging that the case made it all the way to jury trial before being dismissed.

49.     Based on the other information contained on Ms. Teasdale's social media accounts, it is clear to her audience that each time Ms. Teasdale refers to her sexual abuse, abuser, rapist, trafficker, or the like, she is referring to actions allegedly performed by Mr. Hart, despite not explicitly referencing him by name.

50.     Mr. Hart did not physically abuse, sexually abuse or rape Ms. Teasdale at any point in time.

51.     All of Ms. Teasdale's statements suggesting that Mr. Hart physically or sexually abused her either before or during their marriage are false.

52.     Mr. Hart has not sexually abused anyone, despite Ms. Teasdale's allegations.

**Allegations of Sex Trafficking**

53.     In late 2020 Mr. Hart became aware from Ms. Teasdale's Instagram and TikTok pages that she began touting herself as a public speaker, claiming she is a victim of sexual abuse/domestic violence and sex trafficking.

54.     Yet Ms. Teasdale failed to make any allegations regarding sex trafficking by Mr.
Hart in her May 2018 statement, her February 2019 interview with police, her March 2019
witness statement, or her February 2021 witness statement.

55.     Despite never mentioning this purported sex trafficking in any of her prior
statements, Mr. Hart has recently discovered that in August 2020, Ms. Teasdale reported to the
Utah Attorney General's Office that during the course of their marriage, Mr. Hart made attempts
to sex traffic her.

56.     Mr. Hart was unaware that Ms. Teasdale's was publicly alleging that she was sex
trafficked by Mr. Hart until January 2021 when Ms. Teasdale posted the following on her
website:  "In my witness statement, it included that while we were married, I found contracts
between my ex-husband and another man.  He told that man, 'she will be ready for in-person
services soon', referring to my sexual services.  I then saw that the person who my ex-husband
was talking about selling for in-person services … was me."

57.     In the past several weeks Mr. Hart became aware of Ms. Teasdale's false
statements to the Utah Attorney General's office regarding his alleged involvement in sex
trafficking.

58.     Mr. Hart now believes that Ms. Teasdale has spoken at numerous events and,
upon information and belief, has claimed during those speaking engagements that she was
sexually abused and trafficked by Mr. Hart.

59.     Furthermore, in January 2022 Ms. Teasdale publicly announced through a video
posted on her TikTok and Instagram accounts that "An Investigation & case opened with the
Utah Attorney General's Office for Conspiracy of Human Tr@fficking."

60.     Mr. Hart has never been contacted, questioned, or charged with sex trafficking by any law enforcement agency.

61.     Upon information and belief, the only allegations regarding Mr. Hart's involvement in the sex trafficking trade have been perpetuated by Ms. Teasdale.

62.     Upon information and belief, there is currently no investigation by any law enforcement entity into claims that Mr. Hart was in any way involved in the sex trafficking trade.

63.     Mr. Hart has never been involved in the sex trafficking trade nor did he make any attempt to involve Ms. Teasdale in sex trafficking.

64.     None of Ms. Teasdale's claims of abuse or sex-trafficking have ever been substantiated.

65.     Mr. Hart has never been charged with or convicted of sex-trafficking.

66.     Ms. Teasdale was never the victim of sex-trafficking at the hands of Mr. Hart.

67.     Upon information and belief, Ms. Teasdale has perpetuated these false statements as retribution for Mr. Hart's treatment of her during their marriage and in an effort to gain notoriety, bolster her social media following, and further her position as an "influencer".

**Harm to Mr. Hart**

68.     As a result of Ms. Teasdale's outrageous false claims, made both expressly and implicitly, to her large social media following, Mr. Hart has suffered enormous personal, professional, and reputational harm.

69.     Mr. Hart is presently employed as a District Sales Executive.

70.     As a result, his employment requires that he have positive interactions with prospective customers.

71.     Mr. Hart's income is dependent on his reputation.

72.     Mr. Hart's professional standing has diminished because of Ms. Teasdale's false accusations.

73.     Mr. Hart has also suffered personal harm because of the false accusations that have been made regarding his conduct.

74.     Mr. Hart has reached out to Ms. Teasdale on numerous occasions demanding that she remove the defamatory content from her website and social media accounts.

75.     Ms. Teasdale has failed to remove most of the defamatory content and most of these statements are still publicly available as of the filing of this Complaint.

76.     Ms. Teasdale's actions have caused and are substantially likely to continue to cause irreparable harm to Mr. Hart.

77.     Ms. Teasdale's actions are ongoing and are substantially likely to continue.

78.     Mr. Hart's claims are meritorious, and Mr. Hart should prevail on his causes of action.

79.     The balance of harms between the parties strongly favors entry of an injunction against Ms. Teasdale.

80.     Public policy strongly favors entry of an injunction so as to prevent further falsehoods and additional irreparable injuries to Mr. Hart.

**FIRST CAUSE OF ACTION**
(Defamation and Defamation Per Se)

81.     Mr. Hart hereby repeats and incorporates by reference paragraphs 1 through 80 of his Complaint as if fully set forth herein.

82.     Since December 2021, Ms. Teasdale has made defamatory statements about Mr. Hart on numerous occasions through her various social media platforms and publicly available website, which statements include, but are not limited to:

a.      "I went through an abusive marriage & I didn't think I would make it out"

b.      "I am a survivor of sexual assault, online sex-trafficking, sexual exploitation, physical abuse and emotional abuse."

c.      "In my witness statement, it included that while we were married, I found contracts between my ex-husband and another man.  He told that man, 'she will be ready for in-person services soon', referring to my sexual services.  I then saw that the person who my ex-husband was talking about selling for in-person services … was me."

d.      "4 years ago, I went through an abusive marriage and barely made it out"

e.      "I never would've believed you if 4 years ago you told me, I could get out of an abusive relationship"

f.      "Listen to hear the anticipated release of Brit L'Amour's story – After the divorce of her parents, a victim to emotional, mental, physical & sexual abuse, homeless at age 18, trafficked by her own husband, the escape of a false marriage, and a survivor of suicide, Brit dives into how she heals and how she has discovered her true mission in life."

83.     Ms. Teasdale made a number of similar statements to others regarding abuse, sexual abuse, sex trafficking, and other wrongs at the hands of Mr. Hart during their marriage. Some of these statements took place in public, and some in private communications.  All are untrue.

84.     Moreover, Ms. Teasdale's social media profiles and website go back a number of years and are easily accessible to anyone who peruses those sites.

85.     Ms. Teasdale knew these statements were false and intended that the false rumors be spread in the community where Mr. Hart's family lives and where Mr. Hart works.

86.     Ms. Teasdale's statements impugn Mr. Hart's character.

87.     Ms. Teasdale's statements allege that Mr. Hart engaged in criminal conduct, including but not limited to rape, domestic violence, and sex trafficking.

88.     These statements are false.

89.     Ms. Teasdale intended that the statements spread to Mr. Hart and his family's community and to Mr. Hart's friends and family, knowing that the spread of such statements would cause harm to Mr. Hart.

90.     Ms. Teasdale at all times knew or should have known such statements were false.

91.     Ms. Teasdale has made such allegations primarily motivated by spite and ill will, and/or with knowledge that they are untrue, and with the hopes of gaining sympathy and further notoriety as an "influencer," with the hopes of expanding her social media following.

92.     None of the statements made by Ms. Teasdale are subject to privilege under Utah law.

93.     The false and defamatory statements are so injurious to Mr. Hart's character that damage can be presumed from the words alone.

94.     Ms. Teasdale' statements have also caused special damage to Mr. Hart, resulting in substantial pecuniary losses.

95.     As such, these defamatory statements are actionable per se.

96.     Furthermore, Mr. Hart's reputation has been directly injured.

97.     Mr. Hart's has incurred damages in an amount that will be determined at a trial in this matter, but in no event less than $250,000.

98.     Ms. Teasdale's acts demonstrate willfulness or reckless indifference to Mr. Hart's rights and are so egregious as to warrant punitive damages in support of this cause of action.

## SECOND CAUSE OF ACTION
(False Light Invasion of Privacy)

99.     Mr. Hart hereby repeats and incorporates by reference paragraphs 1 through 98 of his Complaint as if fully set forth herein.

100.    Ms. Teasdale made public statements regarding Mr. Hart.

101.    Those statements were made public to, in some instances, more than a million individuals as they were published on Ms. Teasdale's social media accounts and website.

102.    Ms. Teasdale knew that these statements would be made in a public setting and intended that such statements would be spread to the public at large.

103.    Ms. Teasdale's statements publicized a matter concerning Mr. Hart that placed Mr. Hart before the public in a false light as a person who committed domestic violence and engages in sex trafficking.

104.    Ms. Teasdale's statements invaded Mr. Hart's privacy by painting him in a false light.

105.    The false light in which Mr. Hart was placed would be highly offensive to a reasonable person.

106.    Ms. Teasdale knew or recklessly disregarded the falsity of the publicized matter and the false light in which Mr. Hart was placed.

107.    Ms. Teasdale knew or recklessly disregarded that the false statement would be highly offensive to Mr. Hart.

108.    The highly offensive statements include, but are not limited to:

a.      "I went through an abusive marriage & I didn't think I would make it out"

b.      "I am a survivor of sexual assault, online sex-trafficking, sexual exploitation, physical abuse and emotional abuse."

c.      "In my witness statement, it included that while we were married, I found contracts between my ex-husband and another man.  He told that man, 'she will be ready for in-person services soon', referring to my sexual services.  I then saw that the person who my ex-husband was talking about selling for in-person services … was me."

d.      "4 years ago, I went through an abusive marriage and barely made it out"

e.      "I never would've believed you if 4 years ago you told me, I could get out of an abusive relationship"

f.      "Listen to hear the anticipated release of Brit L'Amour's story – After the divorce of her parents, a victim to emotional, mental, physical & sexual abuse, homeless at age 18, trafficked by her own husband, the escape of a false marriage, and a survivor of suicide, Brit dives into how she heals and how she has discovered her true mission in life."

g.      "I was not the only one who had been sexually abused by this man."

h.      "Rape can absolutely happen within a marriage.  No means no, even if you are married."

    i.  "In additional because of extreme sexual abuse and severe trauma I experienced later in my life, I struggled with paranoia after escaping my abuser.  He had sent men after me when I fled the state.  They would call me on unknown numbers and tell me what I was wearing in that exact moment and what they were going to do to me sexually."

    j.  "I was raped multiple times by the same person."

    k.  "[T]he state was charging my ex-husband (my trafficker) with raping me."

    l.  "We're praying that everything will go through the way that it's supposed to and that he can get locked away – there are now multiple victims he raped and exploited coming forward, 1 of which I'm working with as a personal life coach and advocate."

109. Ms. Teasdale made a number of other, similar statements to others regarding abuse, sexual abuse, sex trafficking, and other alleged wrongs at the hands of Mr. Hart during their marriage.  Some of these statements took place in public, and some in private communications.  All are untrue.

110. Ms. Teasdale, at all relevant times, knew such statements were in fact false or, at a minimum, acted with reckless indifference to the truthfulness of such statements.

111. Ms. Teasdale also knew or should have known that such statements would be highly offensive to Mr. Hart.

112. Mr. Hart has been damaged by the false light invasion of privacy based on Ms. Teasdale's false statements.

113.    Such actual damages are in an amount that will be determined at a trial in this matter but are certain to exceed $250,000.

114.    Ms. Teasdale's reckless indifference to Mr. Hart's rights is so egregious as to constitute causing unjust hardship on Mr. Hart and a conscious disregard of Mr. Hart's rights. As such, an award of exemplary and punitive damages is justified.

**THIRD CAUSE OF ACTION**
(Public Disclosure of Private Fact)

115.    Mr. Hart hereby repeats and incorporates by reference paragraphs 1 through 114 of his Complaint as if fully set forth herein.

116.    Ms. Teasdale publicly disclosed the following private facts via her website and her social media accounts:

  a.    Mr. Hart was convicted of multiple counts of distribution of an intimate image of Ms. Teasdale (which was false, as Mr. Hart's conviction related to only one count of distribution of an intimate image);

  b.    Felony charges were brought against Mr. Hart for multiple counts of sexual assault; and

  c.    An investigation and case were opened by the Utah Attorney General's Office for conspiracy of human trafficking.

117.    These public facts are in addition to the other false facts which have been alleged by Ms. Teasdale against Mr. Hart.

118.    All of these are private facts which were not publicly known prior to Ms. Teasdale's public disclosure of them.

119.    It is without question that the public disclosure of these private facts is highly offensive to Mr. Hart and would be offensive and objectionable to any reasonable person.

120.    Moreover, there is no legitimate concern to the public that warranted the disclosure of these facts, many of which are at best only partially true.

121.    Mr. Hart has been damaged by the public disclosure of these private facts.

122.    Such actual damages are in an amount that will be determined at a trial in this matter but are certain to exceed $250,000.

123.    Ms. Teasdale's reckless indifference to Mr. Hart's rights is so egregious as to constitute causing unjust hardship on Mr. Hart and a conscious disregard of Mr. Hart's rights. As such, an award of exemplary and punitive damages is justified.

**FOURTH CAUSE OF ACTION**
(Abuse of Process)

124.    Mr. Hart hereby repeats and incorporates by reference paragraphs 1 through 123 of his Complaint as if fully set forth herein.

125.    On January 14, 2019, Mr. Hart and Ms. Teasdale engaged in a divorce mediation.

126.    As a result of that divorce mediation, Mr. Hart and Ms. Teasdale agreed upon a Decree of Divorce which was filed with the court on January 24, 2019.

127.    Ms. Teasdale, displeased with the outcome of the divorce mediation, arranged to meet with the police to discuss potential assault claims against Mr. Hart.

128.    Upon information and belief, Ms. Teasdale approached the police because the divorce had not gone as planned for her.

129.     Mr. Hart believes that Ms. Teasdale filed this police report for the ulterior purpose of causing harm to Mr. Hart based on her unhappiness with the terms of the divorce and the conflict that led to the breakdown of their marriage.

130.     Ms. Teasdale provided differing stories to authorities including:

  a.   In May 2018 when she indicated she never asked Mr. Hart to stop his actions when the two were engaged in any sexual act;

  b.   January 15, 2019 when she reported that Mr. Hart had never physically abused her and prior to her marriage to Mr. Hart he had merely pressured Ms. Teasdale to perform oral sex on him;

  c.   In March 2019, where Ms. Hart first claimed that Mr. Hart had performed oral sex on her without her consent;

  d.   On or about August 26, 2020 when Ms. Teasdale reported to the Utah Attorney General's office, for the first time, that Mr. Hart had attempted to involve her in the sex trafficking trade; and

  e.   On or about February 23, 2021, when Ms. Teasdale submitted a witness statement where she, for the first time, alleges that there were three instances of sexual abuse perpetrated by Mr. Hart.

131.     In May 2020, Mr. Hart became aware that multiple counts of first degree felony charges of sexual assault had been brought against him.

132.     In the past several weeks Mr. Hart became aware that Ms. Teasdale approached the Utah Attorney General's Office regarding her false claim that Mr. Hart had engaged in sex trafficking.

133.    Ms. Teasdale's willfully altered her statements to authorities in an effort to ensure that serious charges were alleged against Mr. Hart.

134.    Her statements ultimately contradicted one another and, upon information and belief, led to the dismissal of all criminal charges against Mr. Hart, as well as the Utah Attorney General's Office declining to further pursue Ms. Teasdale's allegations.

135.    Ms. Teasdale's false and conflicting statements were willful and were intended to cause significant harm to Mr. Hart.

136.    The totality of the conduct set forth above constitutes an abuse of process against Mr. Hart.

137.    Mr. Hart has been damaged by the abuse of process.

138.    Such actual damages are in an amount that will be determined at a trial in this matter but are certain to exceed $50,000, the amount of attorneys' fees Mr. Hart incurred in defending himself against these wrongful allegations.

139.    Ms. Teasdale's reckless indifference to Mr. Hart's rights is so egregious as to constitute causing unjust hardship on Mr. Hart and a conscious disregard of Mr. Hart's rights. As such, an award of exemplary and punitive damages is justified.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Mr. Hart demands judgment as follows:

1.    That judgment be entered in favor of Mr. Hart;

2.    That Mr. Hart be awarded compensatory damages for costs and damages incurred as a result of the above-described actions in an amount to be determined at trial, but not less than $300,000;

3.      That Mr. Hart be awarded a permanent injunction against Ms. Teasdale restraining her from making further disparaging statements about Mr. Hart;

4.      That Ms. Teasdale be compelled to remove the defamatory statements from all of her social media platforms and be enjoined from publishing further defamatory statements against Mr. Hart in the future, either by name or by reference to his former relationship with Ms. Teasdale;

5.      That Mr. Hart be awarded post-judgment interest at the highest amount permitted by law;

6.      That Mr. Hart be awarded his costs and fees associated with bringing this case;

7.      That Mr. Hart be awarded punitive damages as allowed by law for Ms. Teasdale's intentionally fraudulent conduct and reckless indifference for Mr. Hart's rights as may be determined at trial; and

8.      That the Court grant such other relief as it may deem just and proper.


DATED: March 24, 2023.

Respectfully submitted,

**KUNZLER BEAN & ADAMSON, PC**


*/s/ Ryan B. Bell*
Ryan B. Bell
Marcia Fuller Durkin

*Counsel for Plaintiff Jordan Hart*